# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

MONTE MAUZY,                         §
                                     §
            *Plaintiff,*             §
                                     §
*versus*                             §        CIVIL ACTION NO. 5:12-866
                                     §
CAROLYN W. COLVIN,                   §
Acting Commissioner of              §
Social Security,                     §
                                     §
            *Defendant.*             §

## REPORT AND RECOMMENDATION

Monte Mauzy ("Mauzy") seeks review of an adverse decision on his applications for disability insurance benefits under the Social Security Act.

## I.  Judicial Review

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence.  *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g). Even then, Congress directs courts, when reviewing acts of administrative agencies, to take "due account" of "the rule of prejudicial error."  5 U.S.C. § 706; *see also* 28 U.S.C. § 2111 (directing that judgments given upon examination of records be "without regard to errors or defects which do not affect the substantial rights of the parties"); *see also* FED. R. CIV. P. 61 (stating that "the court must disregard all errors and defects that do not affect any party's substantial

rights"). The net effect of these limitations is that judicial review is quite deferential to the Commissioner's presumed expertise.

This means that reviewing courts cannot retry factual issues *de novo* or substitute their interpretations of administrative records for that of the Commissioner when the record contains substantial support for the decision. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998). Similarly, reviewing courts cannot resolve evidentiary conflicts or appraise credibility of witnesses, including claimants. *Aponte v. Secretary, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). Neither can reviewing courts overturn administrative rulings because they would reach different conclusions were the matter to come before them in the first instance. *See Campbell v. Astrue*, 465 Fed. App'x 4, 5 (2d Cir. 2012).

## II.  Background

Mauzy seeks social security disability insurance benefits for disability due to a head and ankle injury, back problems, knee injury, and "no feeling in left arm." (T. 223).[1] Administrative law judge, David Shaw, ("ALJ Shaw") denied Mauzy's application. (T. 77-85). The Appeals Council declined review; Mauzy then instituted this proceeding.

## III.  Commissioner's Decision

ALJ Shaw found that Mauzy has "status post open reduction internal fixation of the left ankle," and low back disorder which constitute "severe" impairments in that they produce more than minimal functional limitations. (T. 79). With respect to carpal tunnel syndrome, however, ALJ Shaw concluded

---

[1] "T." followed by a number refers to the page of the administrative record. (Dkt. No. 9).

that "the record does not show that carpal tunnel syndrome . . . is a severe impairment." (T. 83).

Mauzy's impairments are not so extreme in degree as to be presumptively disabling. Rather, they only reduce Mauzy's capacity to perform work-related activities to the sedentary exertional level with a sit/stand option. (T. 80). With this reduced residual functional capacity, however, Mauzy can no longer perform his past relevant work as a cook, dishwasher, or dairy farm laborer. (T. 83).

Relying on expert vocational testimony, ALJ Shaw found that Mauzy can still perform alternative, available work as a "frame inspector," "dowel inspector," "final optical assembler," or "stuffer of toys." Mauzy, therefore, "has not been under a disability," and his claim was denied. (T. 84).[2]

## IV.  Points of Alleged Error

In coming to the above decision, ALJ Shaw acted on existing evidence before him when determining that Mauzy does not suffer from a severe carpal tunnel syndrome impairment; he also weighted a consulting examiner's medical opinion more heavily than that of a treating physician with respect to all alleged impairments; he further found Mauzy's subjective self-evaluation of intensity, persistence and limiting effects of his pain and other potentially disabling symptoms to lack credibility; and his hypothetical question to an expert vocational witness posed that a person of Mauzy's age, education and work experience has residual functional capacity for sedentary work, limited only by the need for a sit or stand option. Disagreeing with each action, Mauzy's brief proffers four errors:

---

[2]     ALJ Shaw's complete findings and conclusions appear on six pages, T. 79-84, of the administrative transcript contained in the record before the court. (Dkt. No. 9).

1.      the ALJ failed to obtain additional records from treating
        physicians Dr. Stackman and Dr. Keating; and an opinion of
        Plaintiff's function-by-function limitations from Dr. Stackman;
        thereby failing to properly develop the record;

2.      the ALJ's residual functional capacity finding is unsupported by
        substantial evidence;

3.      the ALJ's credibility determination is unsupported by substantial
        evidence; and

4.      the ALJ's Step 5 determination is unsupported by substantial
        evidence.

(Dkt. No. 12, pp. 1, 10-23).

Mauzy primarily attacks ALJ Shaw's assessment of residual functional capacity for sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a), limited only by a requirement for a "sit/stand option."   Mauzy argues that this finding is flawed because it was made in absence of a fully-developed record (Point 1); because it was based on vague findings of a consultative examiner and an unclear, meaningless finding regarding weight afforded to a treating physician's opinion (Point 2); and because Mauzy's subjective testimony was rejected improperly by overlooking portions and by employing an incorrect assessment technique (Point 3).

Mauzy's final argument (Point 4) attacks the Step 5 finding that he can perform alternative and available work.  This argument is premised on an assertion that expert vocational testimony cannot constitute substantial evidence to support such finding when given in response to a hypothetical question that did not pose all of Mauzy's significant impairments and limitations.

Under this district's practice, the parties marshal their arguments on these issues through competing briefs.[3]

## V. Introductory Considerations

### A. Duty to Develop Record

In the Social Security Act, Congress imposes on the Commissioner an affirmative duty to develop the medical record:

> In making any determination with respect to whether an individual is under a disability . . . , the Commissioner of Social Security . . . shall develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability. . . . [T]he Commissioner of Social Security shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make such determination, prior to evaluating medical evidence obtained from any other source on a consultative basis.

42 U.S.C.A. § 423(d)(5)(B). The Commissioner's implementing regulations further require that when evidence in hand is inadequate to determine whether claimants are disabled, administrative law judges shall re-contact treating physicians or other medical sources and request additional records. *See* 20 C.F.R. §§ 404.1512(e), 404.1520(c), 416.912(e), 416.920(c).

Proceedings before the Commissioner, therefore, are not adversarial, but rather remedial in nature. *See Moran v. Astrue*, 569 F.3d 108, 112–13 (2d Cir. 2009); *see also Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999). Toward that end, "[i]t is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting [or continuation] of benefits."

---

[3] *See* General Order #18 dated September 23, 2003 (superseding January 24, 2002 and September 19, 2001 general orders). (Dkt. No. 3).

*Moran*, 569 F.3d at 112-13 (internal quotation marks omitted); *accord Tejada*, 167 F.3d at 774. Accordingly, administrative law judges, as fact finders, may not automatically rely on absence of probative evidence "without making an affirmative effort to fill any gaps in the record . . . ." *Sanchez v. Barnhart*, 329 F. Supp.2d 445, 450 (S.D.N.Y. 2004) (internal quotation marks and citations omitted). Instead, they must make "every reasonable effort to help [the claimant] get medical reports from [his or her] own medical sources." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (quoting 20 C.F.R. § 404.1512(d)). Thus, when evidence in hand is inadequate for an ALJ to determine whether a claimant is disabled, the ALJ should re-contact the treating physician or other medical sources and request additional records. *See also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (noting that when there is an inadequate medical record, the ALJ must *sua sponte* seek additional information). Moreover, "[t]his duty exists even when the claimant is represented by counsel. . . ." *Perez*, 77 F.3d at 47.

B.    *Sequential Evaluation*

Once a fully-developed record exists, administrative law judges then utilize a five-step sequential evaluation procedure prescribed by regulation and approved by courts as a fair and just way to determine disability applications in conformity with the Social Security Act. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (citing *Heckler v. Campbell*, 461 U.S. 458, 461 (1983)). When such evaluations reach Step 4 (as here), adjudicators determine whether claimants can perform their past relevant work. If not,

adjudicators proceed to Step 5 (also as here) where the inquiry centers on whether claimants can still perform alternative and available work.[4]

Both Step 4 and Step 5 findings are made in context of a predicate residual functional capacity finding. "Residual functional capacity" refers to what persons can still do in work settings despite physical and/or mental limitations caused by their impairments and related symptoms, such as pain. *See Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999). Administrative law judges thus decide whether applicants, notwithstanding their impairments, have physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis. Descriptions and observations of limitations from all sources, including claimants and lay persons are admissible and relevant on this issue.[5]

Evidence from multiple sources often conflicts, thus requiring administrative law judges to make *credibility assessments*, that is, decide how much weight to give particular items of evidence. Through various regulations and internal policy rulings, the Commissioner provides guidance in the form of

---

[4]    A full discussion of the Commissioner's five-step process is contained in *Christiana v. Commissioner of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

[5]    The Commissioner's regulation provides:

We will assess your residual functional capacity based on all the relevant medical *and other evidence*. . . . We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons.

20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

protocols for determining credibility of subjective testimony,[6] opinions of "treating" sources,[7] opinions of "acceptable" medical sources,[8] and opinions of "other" medical sources."[9] Generally, they follow similar patterns. Testimony and other evidence are compared to objective factors that generally enhance or support credibility. The closer the evidence matches objective factors, the more likely its credibility.

## VI.  Development of the Medical Record

*A.    Evidentiary Hearing*

When the evidentiary hearing was conducted, the relevant medical evidence consisted of a written report of an orthopedic examination from Justine Magurno, M.D., a consultative orthopedic examiner, a "Medical Source Statement"[10] from Catherine Keating, M.D., a treating physician, and electrodiagnostic study results and impressions from Jody Stackman, M.D., a neurologist to whom Mauzy was referred by Dr. Keating for specialist evaluation

---

[6]     *See* 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, at *2 (SSA July 2, 1996).

[7]     *See* 20 C.F.R. §§ 404.1502, 416.902 ("Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.").

[8]     20 C.F.R. §§ 404.1513(a), 416.913(a). "Acceptable medical source refers to one of the sources described in § 404.1513(a) who provides evidence about your impairments. It includes treating sources, nontreating sources, and nonexamining sources."  20 C.F.R. §§ 404.1502, 416.902.

[9]     "Other" sources are ancillary providers such as nurse practitioners, physician assistants, licensed clinical social workers, and therapists.20 C.F.R. §§ 404.1513(d), 416.913(d); SSR 06-03p, 2006 WL 2329939, at *2.

[10]     (T. 445-47).  The statement consists of a fill-in-the-blank and check-the-box questionnaire wherein Dr. Keating opines about Mauzy's impairments.

and treatment.  Treatment notes from doctors Keating and Stackman, however, were not in hand.

ALJ Shaw noted these deficiencies as relevant to Mauzy's claimed carpal tunnel syndrome impairment.  He stated that Dr. Keating's "Medical Source Statement" "needed some backup records. " (T. 59, 69).  He further mused that "Honestly, I think this case may turn on [Dr. Stackman's records regarding Mauzy's carpal tunnel syndrome]." (T. 59).  Accordingly, he offered to leave the record open and wait before rendering a decision in order to see whether "we can fill in the gap that I feel exists at any rate concerning the hand situation." (T. 69).  ALJ Shaw then left the record open for one week, until August 9, 2011, for Mauzy to submit additional records.  (T. 46).

## B.    *Post-Hearing Evidence*

Mauzy's counsel indicated that he would obtain additional records.  (T. 45-47).  And, on August 5, 2011, he submitted treatment notes from  neurologist Dr. Stackman covering the period of November 4, 2010 through January 6, 2011,  (T. 13, 448-56), and an updated "Medical Source Statement" from from Dr. Keating.  (T. 457-58).  Dr. Keating's treatment notes, however, still were not produced.

On August 9, 2011, Mauzy's counsel requested an additional one-week extension (*i.e.*, until August 16, 2011) to obtain and submit treatment records from Dr. Keating.  (T. 11).  On August 23, 2011, Mauzy's counsel sent ALJ Shaw a letter requesting his assistance in obtaining Dr. Keating's medical records, mentioning financial inability to pay for such records.  (T. 10).  The record before the court does not reflect that ALJ Shaw formally acted on either request.

ALJ Shaw rendered his decision on September 16, 2011. At that time, no further records from any source had been tendered, nor had counsel indicated that more were forthcoming.[11]

## C.    Challenge to Adequacy of the Record

Mauzy mounts two principal objections to adequacy of the record on which ALJ Shaw based his decision. First, he argues that the records regarding neurologist Dr. Stackman's treatment are incomplete. Dr. Stackman saw Mauzy for "almost a year," but the treatment notes in the record pertain only to Dr. Stackman's treatments from November, 2010, through January, 2011.[12] Second, Mauzy argues that ALJ Shaw erred in proceeding without Dr. Keating's treatment notes, especially because Dr. Keating was a long-term treating physician, and ALJ Shaw had indicated both willingness to assist in obtaining that evidence and flexibility in allowing time to obtain it.

## D.    Discussion

Mauzy accurately observes that ALJ Shaw decided the application without benefit of treatment notes from Dr. Keating or (apparently) a full set of treatment notes from the neurological specialist, Dr. Stackman. Mauzy further notes that in so doing, ALJ Shaw acted unexpectedly and mercurially, given his explicit assurances at the hearing that he was available to assist in obtaining the evidence and that an extra week allowed was just a start. (T. 69). Finally,

---

[11]    A record of treatment by Dr. Keating on September 29, 2011, thirteen days _after_ ALJ Shaw's hearing decision, was submitted to the Appeals Council. (T. 459-66).

[12]    Mauzy also complains, but does not elaborate with argument, that the records from Dr. Stackman are inadequate because they do not include opinions as to Mauzy's function-by-function limitations. This same challenge is lodged with respect to sufficiency of the evidence regarding Dr. Magurno's opinions regarding Mauzy's functional capacity. The argument is addressed substantively in the subsequent section dealing with Dr. Magurno's evidence.

Mauzy correctly argues that ALJ Shaw considered Dr. Stackman's evidence regarding carpal tunnel syndrome to be of critical importance, and that he acknowledged that "obviously we agree that there has to be more" from Dr. Keating than was in the record. (*Id.*).

The question remains as to whether these omissions and unsporting actions rise to the level of reversible error. Mere absence of some medical records does not suffice. An affirmative obligation to develop an administrative record does not extend to infinity, and is not without limit. *See Guile v. Barnhart*, No. 5:07-cv-259 (GLS), 2010 WL 2516586, at *3 (N.D.N.Y. June 14, 2010). Reviewing courts require only *reasonable* efforts to help claimants get medical reports from their own medical sources. *Perez*, 77 F.3d at 47. The Commissioner's implementing regulations recognize that further development of the record is unnecessary, and administrative law judges may make determinations based upon existing evidence when it is consistent and sufficient to determine whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520b(a), 416.920b(a). Likewise, reviewing courts hold that administrative law judges are not required to seek additional information absent "obvious gaps" that preclude an informed decision. *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999); *see also Hart v. Commissioner of Soc. Sec.*, No. 5:07–CV–1270 (DNH), 2010 WL 2817479, at *5 (N.D.N.Y. July 10, 2012).

Although ALJ Shaw acted laconically, that circumstance, alone, does not detract from fact that he acted reasonably overall to help Mauzy secure additional records from his treating physicians. Effectively, he allowed six extra weeks' time to present more evidence, and he relied on Mauzy's hearing counsel to develop it. The Second Circuit (in an unpublished opinion) and multiple district courts have indicated that administrative law judges may, under certain

circumstances, satisfy their duty to develop the record by relying on claimant's counsel to obtain additional medical documentation. *See Jordan v. Commissioner of Soc. Sec.*, 142 Fed. App'x 542, 543 (2d Cir. 2005) (summary order)*; see also Pagan v. Astrue*, No. 11–CV–825, 2012 WL 2206886, at *8 (N.D.N.Y. June 14, 2012) (McAvoy, J.); *Casson v. Astrue,* No. 10-cv-1537 (LEK/ATB), 2011 WL 6955837, at *8 n.15 (N.D.N.Y. Nov. 9, 2011); *Dutcher v. Astrue*, No. 09–CV–1161 (LEK/VEB), 2011 WL 1097860 at *6 (N.D.N.Y. Mar.7, 2011); *Rivera v. Commissioner of Soc. Sec.*, 728 F. Supp.2d 297, 330 (S.D.N.Y. 2010).

The ultimate issue turns, then, on whether evidence in hand – both that existing at the time of the hearing plus additional evidence from Dr. Keating and Dr. Stackman submitted after the hearing – was adequate for ALJ Shaw to determine whether Shaw's left arm pain (carpal tunnel syndrome) is a severe and disabling impairment.

First, the "gap" in the evidentiary record was obvious but not conspicuous in the sense of being a complete void on the nature and limiting effects of Mauzy's claimed carpal tunnel impairment. Rather, ALJ Shaw had evidence from three separate medical sources. Justine Magurno, M.D., assessed Mauzy's functional limitations, and opined that Mauzy has no limits in using his hands. During examination, Mauzy's hand and finger dexterity was intact, and his grip strength was 5/5 bilaterally. (T. 366-69). Jody Stackman, M.D., the neurological specialist who actually treated Mauzy and conducted an electromyographic study, opined that Mauzy has only a "mild" median nerve entrapment at his left wrist, but no evidence of more generalized polyneuropathy. (T. 450). Finally, Catherine Keating, M.D., Mauzy's treating physician, submitted two Medical Source Statements. The original statement reflected her diagnosis of carpal

tunnel syndrome, and her opinion that Mauzy can rarely grasp and turn objects with his hands, and can rarely "fine manipulate" with his fingers. (T. 445-46). The second, updated statement opined that Mauzy's limitation of function has existed since 2006, although acknowledging that her treatment did not commence until 2009. (T. 458). Dr. Keating also opined in her updated statement that Mauzy has chronic pain issues that would not improve with cessation of alcohol. (T. 457).

Second, this body of evidence was sufficiently robust for ALJ Shaw to make a reliable disability determination with respect to the claimed carpal tunnel impairment. ALJ Shaw had evidence from two medical specialists (doctors Magurno and Stackman), neither of whom opined that Mauzy is limited substantially from performing work activities by virtue of carpal tunnel syndrome. He had contrary evidence from a non-specialist treating physician (Dr. Keating). While Dr. Keating's treatment notes were not in evidence, and all of Dr. Stackman's treating notes were not produced, ALJ Shaw did receive and consider post-hearing evidence from both sources. Mauzy does not suggest that any missing notes likely contain additional, objective clinical findings that would counterbalance and possibly outweigh the evidence on which ALJ Shaw acted. In absence of such a suggestion, a reviewing court has no basis to conclude that ALJ Shaw might have come to a different result had Dr. Keating's treatment notes and the remainder of Dr. Stackman's notes been produced.

Indeed, quite the opposite inference is warranted. Treatment notes from Dr. Stackman before ALJ Shaw were those pertaining to Dr. Stackman's more specialized treatments and indicate Dr. Stackman's current assessment. Dr. Keating's missing treatment notes, on the other hand, likely would lack significant probity because she referred Mauzy to a specialist for objective

clinical and laboratory findings, and her opinions generally lack credibility due to her leaning over backward to help Mauzy (*e.g.,* by expressing unfounded opinions regarding functional limitations supposedly existing before her treatment relationship with Mauzy ever began).

The evidentiary record, despite its potholes, was adequate to determine whether Mauzy has a disabling carpal tunnel impairment. ALJ Shaw did not err, therefore, by failing to seek additional information from doctors Keating and Stackman.

## VII.  Weighting of Medical Evidence

Mauzy's second point attacks ALJ Shaw's weighting of the medical evidence. When assessing Mauzy's residual functional capacity, ALJ Shaw gave "significant weight" to opinions of Dr. Magurno (consultative orthopedic examiner) (T. 83, 366-69), and "lesser weight" to opinions of Dr. Keating (treating physician). (T. 83, 445-47, 457-58). Mauzy argues that both credibility choices were erroneous. He contends that Dr. Magurno's opinions were so vague as to preclude an inference that Mauzy can perform exertional requirements of sedentary work. He argues that ALJ Shaw erred by failing to state what "specific weight" was afforded to Dr. Keating's opinions.

*A.    Dr. Magurno*

Dr. Magurno conducted a full orthopedic examination of Mauzy, the objective results of which are summarized in the note below.[13] Dr. Magurno

---

[13]    Mauzy was in no acute distress.  (T. 368).  His gait was normal holding a cane.  His station was normal. He could stand on his heels.  (T. 368). He demonstrated some reduced range of motion in his lower back, right shoulder, right hip, left ankle, and right foot.  (T. 368-69).  His reflexes and sensation were normal.  He had no joint effusion, inflammation, or instability in the extremities.  He retained full strength in the extremities, save for slightly
(continued...)

ultimately diagnosed Mauzy with right shoulder, left ankle, and lower back pain. (T. 369). With respect to functional effects of these symptoms, Dr. Magurno opined that Mauzy has *no* limitations in sitting, reaching, pushing and pulling on the left, or with fine motor activities; *mild* limitations in reaching, pushing, and pulling on the right, and for bending; *moderate* limitations in walking, standing, and sitting; and *marked* limitations in lifting and carrying. (T. 369).

Mauzy cites a Second Circuit decision, *Curry v. Apfel,*[14] and district court cases in accord therewith for the proposition that a consultative examiner's use of the terms "moderate" and "mild," without additional information, are so vague and insufficient to permit an inference that an individual can perform requirements of exertional levels of work. This assertion undoubtedly is correct in the context of complex medical scenarios. However, use of terms like "mild" and "moderate" has been held to pass substantial evidence muster when medical evidence shows relatively little physical impairment. *See Waldau v. Astrue*, No. 5:11-cv-925, 2012 WL 6681262, at *4 (N.D.N.Y. Dec. 21, 2003) (Sharpe, J.). Moreover, in such circumstances, administrative law judges may permissibly render common sense judgments about functional capacity even without physicians' specific functional assessments. *Id.*

Consultative examiners' use of imprecise and nebulous terms regarding functional limitations raise red flags. Administrative law judges following best practices might well be advised to recontact such examiners routinely for

---

[13](...continued)
reduced dorsiflexion in the left foot and atrophy of the left calf. (T. 368-69). Mauzy's hand and finger dexterity was intact, while his grip strength was full. (T. 368). Dr. Magurno noted only tenderness in the lower back, without spasms, trigger points, or palpable abnormalities. (T. 368). A straight leg test was negative. (T. 368-69).

[14]    209 F.3d 117, 123 (2d Cir. 2000)

clarification. From judicial review perspective, however, an administrative law judge's reliance on such vague terms is a contextual error rather than a *per se* error requiring remand. Thus, reviewing courts must weigh the impact of vague language in its unique factual context. Specific accompanying information may cure the intrinsic flaw in vague verbiage. And, as noted above, vague language can be less problematic in cases involving modest examination findings and benign diagnoses.

In any event, there is no basis for the court to conclude that Dr. Magurno's consultative opinion here is too vague to constitute substantial evidence supporting ALJ Shaw's finding that Mauzy has residual functional capacity for sedentary work. Dr. Magurno is deemed an expert in the field of Social Security disability evaluation.[15] Dr. Magurno did not use vague language when stating that Mauzy has *no limits* in sitting and using his hands (T. 369) which is primarily what sedentary work entails.[16] Thus, this is not a case that compels a reviewing court to conclude that a consultative examiner's vague findings

---

[15]    *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i). These provide:

State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation.

*Id.*

[16]    The regulation defines "sedentary work" as follows:

(a) Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

prevent an inference that Mauzy can perform exertional requirements of sedentary work.

## B.    Dr. Keating

Dr. Keating's "Medical Source Statement" expresses opinions that Mauzy's impairments result in far more dysfunction than observed by other medical sources.  (T. 445-47).  Her clinical observations are summarized in the note below.[17]  She also opined that Mauzy would be off task more than 20% of an 8-hour workday, and that "due to multiple medical conditions, this pt would be unable to work."  (T. 447).

### 1.    Weight Given

ALJ Shaw's decision reflects that he accorded "lesser weight" to Dr. Keating's opinion (than accorded to Dr. Magurno) "because it is not wholly consistent with the record."  (T. 83).  He concluded that Dr. Magurno's opinion was better supported by clinical notes and the balance of the record.  (*Id.*).  ALJ Shaw also mentioned the incredulous portion of Dr. Keating's Medical Source Statement wherein she notes that Mauzy had been her patient only since 2009,

---

[17]    Dr. Keating treated Mauzy for two years since 2009.  (T. 445).  Dr. Keating diagnosed Mauzy with low back pain, bilateral carpel tunnel syndrome, and alcohol abuse.  (T. 445).  In regards to Mauzy's hands and fingers, Dr. Keating opined that Mauzy could rarely grasp, and turn objects, with his hands; and could rarely fine manipulate with his fingers.  (T. 446).  Dr. Keating also opined that Mauzy could walk half a block; sit for 10 minutes at one time; stand for 1 hour at one time; and he would need a job permitting shifting positions at will from sitting, standing, or walking. Dr. Keating further stated that Mauzy would need to take unscheduled breaks very frequently during an 8-hour workday, and that when he is engaged in occasional standing, or walking, he must use a cane or another assistive device.  (T. 445-46).  Dr. Keating opined that Mauzy could lift occasionally 20 pounds and could never twist, stoop, bend crouch squat or climb.  (T. 446-47).

Dr. Keating's updated, post-hearing Medical Source Statement dated August 4, 2011, states that Mauzy's chronic pain issues will not improve with the cessation of alcohol.  (T. 457).  She further opined that Mauzy's limitation of function noted in her first Medical Source Statement has existed since 2006 even though she acknowledged seeing him only since 2009.  (T. 458).

but opined that Mauzy's physical function had been limited since at least March 15, 2006. (T. 82, 458).

## 2. Challenge to Dr. Keating's Credibility Assessment

Mauzy faults this credibility choice as erroneous because it fails to "state what *specific weight* was afforded to the opinion of treating physician Dr. Keating and it is otherwise unclear from the decision." (Dkt. No. 12, p. 20 emphasis added). Mauzy bases this argument on *English v. Commissioner of Soc. Sec.*, No. 6:05-CV-905 (LEK/GJD), 2008 U.S. Dist. LEXIS 7762, at *14 (N.D.N.Y. Jan. 24, 2008) (Kahn, J.). There, the court stated:

> "[T]he ALJ failed to state what specific weight he assigned to [treating physicians'] opinions, *which was error.*"

*Id.* (emphasis added). The court based this observation on a regulation, 20 C.F.R. § 404.1527(d)(2), and an interpretive ruling, Social Security Ruling 96-2p.[18]

## 3. Discussion

*English* is inapposite. There, an administrative law judge rejected treating physician opinions with no more than a terse statement that such opinions were "inconsistent with their treatment records, which indicate the claimant was disabled from his *former employment*, not *all work*." *English*, 2008 U.S. Dist. LEXIS 7762, at *14 (emphasis added). In that court's view, such language was inadequate to make clear to subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and reasons therefor.

Here, ALJ Shaw explicitly stated that he afforded "lesser weight" to Dr. Keating's opinion. The regulation and ruling cited in *English* use generic

---

[18]    SSR 96-2p, TITLES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE MEDICAL OPINIONS, 1996 WL 374188 (SSA July 2, 1996).

weighting descriptors such as "controlling," "special significance," great," "more" and "less."[19] ALJ Shaw's term, "lesser," is as specific as "less." Any difference between ALJ Shaw's language and the Commissioner's formal language contained in the governing regulation and interpretive ruling is purely semantical.

*English* does not hint that use of "lesser" is insufficiently specific. Mauzy's brief does not proffer a more appropriate term. Thus, there is no intrinsic error in how ALJ Shaw articulated his weighting of Dr. Keating's testimony.

A more purposeful inquiry is whether ALJ Shaw's articulation is adequate to make clear to subsequent reviewers the reasons why he gave lesser weight to Dr. Keating's opinions. While ALJ Shaw's articulation is no model of clarity, it is sufficiently specific to survive highly deferential judicial review. ALJ Shaw compared Dr. Keating's opinions with the entire medical record and found them to be inconsistent. He contrasted Dr. Keating's opinions with Dr. Magurno's opinions that were "better supported" with treatment notes. He flagged the incongruity of Dr. Keating's efforts to opine as to Mauzy's functional limitations existing as much as three years before Mauzy became Dr. Keating's patient. These reasons correlate with the factors of supportability, consistency, treatment or examining relationship, and degree of specialization that regulations require administrative law judges to consider when determining how much weight to afford medical opinion when it is not given controlling weight. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

---

[19]     *See* 20 C.F.R. §§ 404.1527(c)(2), 404.1527(e)(2)(ii), 416.927(c)(2), 416.927(e)(2)(ii); SSR 96-2p, 1996 WL 374188, at *1-4; SSR 96-5, TITLES II AND XVI: MEDICAL SOURCE OPINIONS ON ISSUES RESERVED TO THE COMMISSIONER, 1996 WL 374183, at *1-6 (SSA July 2, 1996); SSR 96-8, TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 1996 WL 374184, at *7 (SSA July 2, 1996); SSR 06-03p, TITLES II AND XVI: CONSIDERING OPINIONS AND OTHER EVIDENCE FROM SOURCES WHO ARE NOT "ACCEPTABLE MEDICAL SOURCES" IN DISABILITY CLAIMS, 2006 WL 2329939, at *2, 5 (SSA Aug. 9, 2006).

There is no reversible error in ALJ Shaw's weighting of medical evidence obtained from Dr. Keating.

## VIII.  Subjective Testimony

### A.  *Mauzy's Self-Assessment*

Mauzy testified that he is unable to work because of his impairments, and that lower back pain is his most severe physical ailment.  (T. 53).  He experiences consistent stabbing pain in his back.  (T. 53-54).  Without medication he "can't tolerate it." (T. 53).  With medication,"it subsides about half." (*Id*.).

His next most severe ailment is his left ankle.  (T. 54).  In 2006, he suffered a compound fracture and has had several surgeries over the years. (T. 54-55).  His doctor is contemplating taking bone from his hip for his ankle. (*Id*.).

Mauzy further testified that carpal tunnel syndrome causes him to have no feeling in his hands half the time. (T. 55). He claims they tingle. (*Id*.). That makes it difficult to pick up and hold on to objects.  (*Id*.).

Regarding daily activities:  he cannot stand for long periods, which limits his ability to perform housework such as dishes and cleaning (T. 56-57); he can only stand for 20 minutes before having to sit (T. 57); he can only sit for 10 minutes, depending on the chair, before needing to stand up and move around. (*Id*.); he can walk about half a city block  (*Id*.);  his dog's food weighs about 50 pounds, and its all he can do to lift and carry it about 10 feet twice a month (T. 57-58); he cannot push or pull anything; he has a hard time bending; he cannot do very many stairs; and he does not have much of a grip.  (T. 58-59).

### B.  *ALJ Shaw's Assessment of Mauzy's Credibility*

ALJ Shaw stated that in making his residual functional capacity finding, he "considered all symptoms and the extent to which these symptoms can

reasonably be accepted as consistent with the objective medical and other evidence, based on the requirements of 20 C.F.R. 404.1529 and 416.929 and SSRs 96-4 and 96-7p." (T. 80). ALJ Shaw ultimately concluded that Mauzy's subjective statements concerning intensity, persistence and limiting effects of his symptoms are "not supported to the extent they are inconsistent with the above residual functional capacity assessment." (T. 81).

## B.     Challenge to Credibility Choice

Mauzy argues ALJ Shaw's evaluation of his credibility reflects error in two respects. First, Mauzy contends that ALJ Shaw overlooked or ignored relevant portions of his subjective testimony because he failed to describe the full extent of Mauzy's subjective complaints. Second, Mauzy argues that ALJ Shaw's articulation of his credibility assessment is, at best, meaningless boilerplate insusceptible to judicial review, at worst, reflective of affirmative error in assessing credibility of subjective testimony. This latter argument is based on a growing body of cases holding it is error to measure a claimant's credibility only by assessing consistency of his statements with an administrative law judge's own predetermined residual functional capacity finding, instead of evaluating all the relevant factors bearing on a claimant's credibility prior to deciding claimant's residual functional capacity.[20]

## C.     Commissioner's Prescripts for Weighing Subjective Testimony

Pain is an important element in disability claims, and pain evidence must be thoroughly considered. *See Ber v. Celebrezze*, 332 F.2d 293, 298–99 (2d Cir. 1964). The best-informed (sometimes only) source of information regarding intensity, persistence and limiting effects of pain and other potentially disabling

---

[20]     *See Cornell v. Astrue*, No. 7:11-CV-1064 (GTS), 2013 WL 286279, at *8 & n.4 (N.D.N.Y. Jan. 24, 2013)(collecting cases).

symptoms is the person who suffers therefrom. Testimony from claimants, therefore, is not only relevant, but desirable.

On the other hand, such testimony may be colored by the claimant's interest in obtaining a favorable outcome. Hence, subjective symptomatology by itself cannot be the basis for a finding of disability. A claimant must present medical evidence or findings that the existence of an underlying condition could reasonably be expected to produce the symptoms alleged.[21] Thus, it is rudimentary that an administrative law judge is "not require[d] to accept subjective complaints without question." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). Rather, an administrative law judge "may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Id.* And, for judicial review purposes, nothing is more firmly established than that "[i]t is the function of the [Commissioner], not [the Courts], ... to appraise the credibility of witnesses, including the claimant." *Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

The Commissioner provides explicit guidance to help administrative law judges decide how much weight to give claimants' subjective self-evaluations. First, a formally promulgated regulation requires—once an impairment is identified—consideration of seven specific, objective factors that naturally

---

[21] *See* 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, at *2 (SSA July 2, 1996); SSR 96-4p, TITLES II AND XVI: SYMPTOMS, MEDICALLY DETERMINABLE PHYSICAL AND MENTAL IMPAIRMENTS, AND EXERTIONAL AND NONEXERTIONAL LIMITATIONS, 61 Fed. Reg. 34488-01, 34489, 1996 WL 362210 (SSA July 2, 1996).

support or impugn subjective testimony of disabling pain and other symptoms.[22]

Second, a ruling directs administrative law judges to follow a two-step process:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment (s) . . . that could reasonably be expected to produce the individual's pain or other symptoms . . . .

> Second, ... the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities . . . .

*See* SSR 96-7p, TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, at *2 (SSA July 2, 1996). The Ruling further provides that "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." *Id.*[23]

---

[22] An administrative law judge must evaluate a claimant's symptoms, including pain, based on the medical evidence and other evidence, including he following factors:

(i) claimant's daily activities;
(ii) location, duration frequency, and intensity of claimant's pain or other symptoms;
(iii) precipitating and aggravating factors;
(iv) type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate her pain or other symptoms;
(v) treatment, other than medication, claimant receives or has received for relief of her pain or other symptoms;
(vi) measures claimant uses or has used to relieve pain or other symptoms; and
(vii) other factors concerning claimant's functional limitations and restrictions due to pain or other symptoms.

*See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

[23] Governing circuit law generally mirrors the Commissioner's Ruling. Thus, when administrative law judges reject claimants' testimony of pain and limitations, they must provide explicit reasons for rejecting the testimony. *See Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988); *Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983).

*D.    Application*

The first prong of Mauzy's argument is unpersuasive, and requires little discussion.  While ALJ Shaw's written summary of Mauzy's subjective testimony does not describe all of Mauzy's subjective complaints, the mere fact that an administrative law judge fails to *mention* a particular item of evidence does not permit an inference that the evidence was not *considered*.[24]  In view of ALJ Shaw's affirmative statement that he "considered all symptoms," a more permissible inference, absent some specific reason to think otherwise, is that ALJ Shaw considered but rejected such evidence.

The second prong of Mauzy's challenge has more initial substantive appeal.  ALJ Shaw did, indeed, articulate his credibility assessment of Mauzy's subjective testimony in terms of meaningless and suspicious boilerplate language.  Were such language the *only* reason he provided, a reviewing court might well agree that such credibility choice was defective and unsusceptible to meaningful judicial review.  However, ALJ Shaw made clear that in making his residual functional capacity finding , he considered all symptoms based on the requirements of 20 C.F.R. 404.1529 and 416.929 and 96-7p.  (T. 80).  This reflects his awareness of and intention to employ the objective factors identified in the Regulations and the two-step process required by the applicable Ruling.  And, upon independent examination, ALJ Shaw's decision confirms that he did explicitly consider factors outlined in the Regulations, to the extent there was evidence thereof, including objective findings, effects of medicinal and non-medicinal treatment, and activities of daily living.  (T. 80-83).  For instance, ALJ Shaw noted Mauzy's relief with pain medications, braces, and a TENS Unit;

---

[24]    *See Brault v. Social Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) ("[a]n ALJ does not have to state on the record every reason justifying a decision," nor is an ALJ "required to discuss every piece of evidence submitted.") (internal quotations and citation omitted); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.").

his daily activities, including cleaning floors on hands and knees and carrying 50 pound bags of dog food;[25] and minimal findings on x-ray and MRI. (T. 80-81). He provided explicit reasons for finding Mauzy's subjective complaints not supported. (T. 80-83). Thus, there is no structural legal error in ALJ Shaw's approach to assessing credibility of Mauzy's subjective testimony regarding persistence, intensity and limiting effects of his symptoms.

While some reasons given by ALJ Shaw are stronger than others, all have evidentiary bases, and, in each instance, the evidence satisfies the highly deferential "more than a scintilla" substantial-evidence standard.[26] There is no basis, therefore to reverse the Commissioner's decision because of a legal or evidentiary error in assessing Mauzy's credibility.

## IX.   Step 5 Finding

ALJ Shaw found that Mauzy's residual functional capacity for sedentary work, limited only by the need for a sit/stand option, permits him to perform alternative and available work. (*See* Section III., *supra*). The sole evidentiary basis for this finding was testimony from an expert witness in response to a hypothetical question that was intended to portray an individual of Mauzy's age, education, work experience and residual functional capacity. Mauzy argues that such testimony does not constitute substantial evidence for such finding because the hypothetical question was incomplete.

---

[25]     Mauzy claims difficulty picking up and holding onto objects; however, he describes his ability to lift and carry a 50 pound bag of dog food. (T. 55, 57-58). "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." See SSR 96-7p, 1996 WL 374186, at *5.

[26]     "Substantial evidence" is a term of art meaning less than a "preponderance" (usual standard in civil cases), but "more than a mere scintilla," or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 378, 401 (1978); *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004).

*A.   Step 5 Evaluation*

At Step 5, the Commissioner has the burden to show that a claimant (whose residual functional capacity does not allow performance of past relevant work) can, nevertheless, do alternative work existing in the national economy. Generally, the Commissioner elicits or consults two principal sources of extrinsic evidence. First, witnesses qualified as "Vocational Experts" may testify as to whether jobs exist for a person with the claimant's precise abilities.[27] Second, a United States Department of Labor publication titled *Dictionary of Occupational Titles* ("DOT") can assist in determining when a claimant's residual work skills can be used in other work and the specific occupations in which they can be used.[28] In limited circumstances, the Commissioner may take administrative notice of disability *vel non* by applying findings published in "*Medical-Vocational Guidelines*," commonly called *"the grids."* [29]

For expert vocational opinion to constitute substantial evidence, a hypothetical question posed to the expert must include all limitations supported by medical evidence in the record. *See Dumas v. Schweiker*, 712 F.2d 1545, 1553–54 (2d Cir. 1983) (The Commissioner may rely on a vocational expert's testimony concerning the availability of jobs suited to a hypothetical person's capabilities so long as the hypothetical is based on substantial evidence.). Conversely, if there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question, the expert's response is not considered substantial evidence. *See DeLeon v. Secretary of Health & Human*

---

[27]     *See* 20 C.F.R. §§ 404.1566(e), 416.966(e); *see also* SSR 00-4p, Policy Interpretation Ruling: Titles II and XVI: Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions, 2000 WL 1898704, at *1-2 (SSA Dec. 4, 2000).

[28]     *See* 20 C.F.R. §§ 404.1560(d)(1), 416.966(d)(1); *see also* SSR 00-4p, 2000 WL 1898704, at *1-2.

[29]     *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

*Servs.*, 734 F.2d 930, 936 (2d Cir. 1984) (where ALJ did not present the full extent of claimant's physical disabilities, decision not supported by substantial evidence). The reason for this requirement is the importance that a vocational expert understand the full extent of an applicant's impairment so that the expert does not declare an applicant capable of undertaking work in the national or local economy that the applicant cannot truly perform.

B.    *Discussion and Application*

Mauzy's incompleteness argument is grounded in ALJ Shaw's failure to include in his hypothetical question posed to the vocational expert various impairments and limitations articulated by treating physician Keating. ALJ Shaw, however, substantially *rejected* Dr. Keating's opinions, and he committed no error in so doing. (*See* Section VII.*B.*, *supra*). Consequently, there was no legal duty to include those rejected functional limitations in hypothetical questions.

The hypothetical questions, however, did pose all limitations contained in ALJ Shaw's residual functional capacity determination. Those functional limitations (sedentary work with a sit/stand option) are supported by substantial evidence. As such, ALJ Shaw's Step 5 determination was free of legal error and is supported by substantial evidence. *See Mancuso v. Astrue*, 361 Fed. App'x 176, 179 (2d Cir. 2010) (explaining that when a residual functional capacity assessment is supported by substantial evidence, it is appropriate to rely on that assessment when questioning the vocational expert).

## X. Recommendation

The Commissioner's decision denying disability-based benefits should be **AFFIRMED**.

## XI.  Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011); *FDIC v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the __30__ day of __September__ 2013.

_Earl S. Hines_

Earl S. Hines
United States Magistrate Judge